**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| MAGNUS AADLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 17-cv-11248-DJC |
| | ) |
| BOAT SANTA RITA II, INC., et al., | ) |
| | ) |
| Defendants. | ) |

_____)

## MEMORANDUM OF DECISION

**CASPER, J.**                                                  **October 15, 2020**

## I.    INTRODUCTION

Plaintiff Magnus Aadland ("Aadland") alleges that Defendant Boat Santa Rita II, Inc. ("BSR II") breached its duty to provide maintenance and is liable for punitive damages for failing to do so (Counts III and IV, respectively).   After a three-day bench trial, the Court now issues its findings of facts and conclusions of law on the claims against BSR II and enters judgment for BSR II on the remaining claims.

## II.    PROCEDURAL HISTORY

Aadland instituted this action against Defendants BSR II, Boat Santa Rita III, Inc., F/V Linda, Francis A. Patania and Salvatore Patania, Jr. (collectively, "Defendants"), asserting various claims.   D. 1.   Aadland voluntarily dismissed F/V Linda.   D. 10.   The remaining Defendants moved for summary judgment on all remaining counts except for Count III.   D. 53.   The Court allowed Defendants' motion for summary judgment as to all claims except the punitive damages claim (Count IV).   D. 63.   Accordingly, the only defendant that remained for the bench trial was

1

BSR II on Count III, the maintenance and cure claim, and Count IV, the punitive damages claim for failure to pay maintenance and cure.   D. 63.

At the bench trial that began on September 14, 2020, D. 110-11, 113, the Court heard from three witnesses, Aadland, Cynthia Aadland ("Mrs. Aadland"), Plaintiff's wife, and Francis Patania ("Patania"), the owner of BSR II.

## III.    FINDINGS OF FACT

1. Aadland was, at all relevant times, the captain of the commercial fishing vessel, the F/V Linda.

2. BSR II was, at all relevant times, the sole owner of the F/V Linda.

3. Patania is the manager and co-owner of BSR II.

4. On July 9, 2014, the F/V Linda left New Bedford with a five-person crew captained by Aadland.

5. On or about July 12 or 13, 2014, a few days into the trip, Aadland fell ill while in the service of the F/V Linda.

6. By July 16, 2014, Aadland was unable to get out of his bunk on the F/V Linda.

7. At Aadland's direction, Tommy Olival, the first mate on the F/V Linda, took control of the vessel and returned to New Bedford.

8. Patania was contacted about Aadland's illness before the vessel returned to New Bedford.

9. Upon the F/V Linda's return to New Bedford on July 18, 2014, an ambulance and Mrs. Aadland met the vessel at the dock and Aadland was taken to St. Luke's

Hospital.

10. Aadland's blood cultures taken at the hospital tested positive for group G Streptococcus bacteria.

11. The extent and cause of Aadland's illness was not initially clear, but it required extensive hospitalization and treatment.

12. Aadland was hospitalized at multiple medical facilities for an extended period, from July 18, 2014 to December 29, 2014 and then again from July 9, 2015 to September 10, 2015.

13. During these hospitalizations, Aadland had to have multiple surgeries including a cardiac surgery on December 5, 2015 and a second cardiac surgery in July 2015.

14. Aadland received Tufts health insurance ("Tufts") through the employer, GAF Engineering, of his wife, Mrs. Aadland, from July 18, 2014 through September 2014.

15. Mrs. Aadland stopped working at GAF Engineering in September 2014.

16. From October 2014 through April 2017, Aadland was covered by a Tufts COBRA health insurance plan.

17. Although the Aadlands sometimes disagreed with Tufts about some of the treatment facilities during his hospitalizations in 2014 and 2015, there was no evidence that Aadland required any medical treatment that he did not receive.

18. In April 2017, Aadland obtained health care coverage through Medicare.

19. While Aadland was hospitalized between July 18, 2014 and December 29, 2014, Defendant did not provide any maintenance, which at $84.00 per day, would have

3

totaled $13,860.

20. Based upon expense information, including mortgage, utilities, food, health insurance premiums and auto insurance expenses, gathered from Aadlands in November 2014 and January 2015 by BSR II's insurance broker, David DuBois of Maritime Claims Associates, LLC, BSR II decided to pay Aadland $84 per day in maintenance and $114 per day in advances.

21.  Since February 5, 2015 (and retroactive to December 30, 2014), BSR II has provided Aadland maintenance at the daily rate of $84.00, including when he was hospitalized from July 6, 2015 to September 10, 2015.

22. BSR II has paid Aadland a total of $175,644.00 in maintenance.

23. Since February 5, 2015, Defendant has paid advances to Aadland at a daily rate of $114.00.   These advance payments total $238,374.00.

24. Aadland has not repaid any of those advances.

25. Aadland's ten-year history of earnings averaged $186,000 per year or approximately $509.58 per day.

26. Retroactive to December 30, 2014, between maintenance of $84/day and advances of $114/day, Aadland has received $198/day from BSR II.

27. The first of the maintenance and advance checks were delivered to Aadland by DuBois on behalf of BSR II on February 5, 2015.

28. The Aadlands used the maintenance and advance payments to pay household bills including but not limited to health insurance premiums.

29. BSR has also paid Aadland $5,388.24 in reimbursement for out-of-pocket medical expenses.

30. Aadland never submitted any other claims for out-of-pocket expenses to BSR II.

31. Throughout his hospitalization, Mrs. Aadland was in regular communication with Patania about Aadland's condition.  They began communicating by text when Patania texted her on the morning of July 18, 2014 to inquire about Aadland's condition.

32. Patania visited Aadland several times during his hospitalization.

33.  Patania was aware that Tufts was paying for Aadland's medical treatment.

34. Although there were numerous setbacks in Aadland's health, there were no indications to Patania or BSR II that he was not receiving reasonable and adequate medical care.

35. In fact, Aadland expected to return to work as early as spring of 2015.

36. There was no expense or bill related to Aadland's medical care that was presented to BSR II that was refused.

37. Although as a vessel owner, Patania had encountered claims from seamen before, this instance was the first time that he had a seaman whose medical bills were paid by a private insurer.

38. Tufts has accepted $400,000.00 from BSR II in full satisfaction of any lien or claim it might have against Aadland or Mrs. Aadland for coverage of Aadland's medical expenses.

39. No other insurer or treatment provider has presented any claim for reimbursement or payment of Aadland's medical expenses.

40. Aadland has not presented any evidence of any unreimbursed out-of-pocket medical expenses.

## IV.   CONCLUSIONS OF LAW

1.   "Maintenance is intended to cover the reasonable costs the seaman incurs in acquiring food and lodging ashore during the period of his illness or disability." see Harper v. Zapata Off-Shore Co., 741 F.2d 87, 91 (5th Cir. 1984) (internal quotation marks and citation omitted).

2.   A shipowner is not required to pay maintenance unless "the seaman is outside the hospital and has not reached the point of 'maximum cure.'"   See Nichols v. Barwick, 792 F.2d 1520, 1523 (11th Cir. 1986) (citing Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979)).

3.   "'Maximum medical recovery' constitutes the dividing line which, when reached, allows the shipowner to terminate maintenance and cure."   Saco v. Tug Tucana Corp., 483 F. Supp. 2d 88, 99 (D. Mass. 2007).   Where it appears that "future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved."   Id.   (internal quotations and citation omitted).   That is, "[w]hen further treatment is merely palliative, rather than curative, a shipowner's obligation to pay

maintenance and cure ends."   <u>Silva v. F.V Silver Fox LLC</u>, 988 F. Supp. 2d 94, 99 (D. Mass. 2013).

4.   There is no evidence that Aadland has not reached maximum medical recovery, particularly where, as of his October 12, 2018 deposition, he attested that he only saw his cardiologist, infectious disease doctor and primary care physician every six months for checkups and, as of July 24, 2019, he was discharged from occupational therapy to begin a home exercise program.

5.   BSR did not pay maintenance during Aadland's first hospital stay in 2014, but did so during his 2015 hospital stay.

6.   Although BSR II paid Aadland maintenance during his 2015 hospitalization, it was not legally obligated to do so then or during his earlier 2014 hospitalization.   <u>See</u> <u>Hunt v. The Trawler Brighton, Inc.</u>, 102 F. Supp. 300, 302 (D. Mass. 1952) (ruling that seaman was entitled to maintenance excluding when he was an in-patient at the hospital); <u>see also</u> <u>Nichols</u>, 792 F.2d at 1524.

7.   Even, assuming <i>arguendo</i> that a shipowner was legally obligated to pay maintenance to a seaman during a hospitalization being covered by a third party (here, Tufts), there has been no showing here that Aadland incurred living expenses during this period of hospitalization that were not otherwise paid, or offset by the advance payments made to him by BSR II.

8.    Since February 5, 2015, Defendant has provided Aadland maintenance at the same daily rate of $84.00.

9.    As to Count III, BSR II has paid adequate maintenance to Aadland.

10.   "Cure is payment of medical expenses incurred in treating the seaman's injury or illness."   Barnes v. Andover Co., LP, 900 F.2d 630, 633 (3rd Cir. 1990).

11.   Aadland made no request for cure from BSR II.

12.   There were no out-of-pocket medical expenses for Aadland that BSR II declined to pay.

13.   Patania was aware that Tufts, a private insurer, was paying Aadland's medical expenses.

**14.**   Contrary to Aadland's contention, the circumstances here are different from Gauthier v. Crosby Marine Serv., Inc., 752 F.2d 1085, 1090 (5th Cir. 1985). Unlike the circumstances there which the court analogized to an instance where a shipowner disregarded an injured seaman's maintenance and cure claim and then wanted to set off any money earned by the seaman during the pendency of the claim, id. (citing Vaughn, 369 U.S. 527, 233 (1962)), there was no such refusal here.  This case is closer to the circumstances distinguished in Gauthier where an injured seaman received care "without cost to himself" such that he had not "incurred any actual expense."  Id. (citing Johnson v. United States, 333 U.S. 46, 50 (1948).  The circumstances here are closer to Johnson where Aadland has not incurred

any medical expenses himself and even his health insurance premiums, which were part of the basis of the calculation of the advances he has received from BSR II, have been covered.

15. Patania was not aware of Aadland suffering any dire financial straits even as he was aware that Aadland was unable to work and Mrs. Aadland had lost her job.

16. There are no outstanding medical expenses or reimbursements for Aadland's medical care that Aadland is obligated to pay.

17. Tufts has no claim or lien against Aadland (or his wife) for medical expenses or reimbursements.

18. As to Count III, under these circumstances, the Court does not conclude that BSR has failed to provide adequate cure.

19. To prevail on Count IV for punitive damages and/or attorneys' fees arising from a failure to pay adequate maintenance and cure, Aadland "bears the burden of proving that defendant was 'callous, willful, or recalcitrant' in withholding maintenance and cure payments." Mulligan v. Maritrans Operating Co., Civ. No. 06-10492-LTS, 2010 WL 1930282, at *5 (D. Mass. May 12, 2010) (citing Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051 (1st Cir. 1973)), on reconsideration, Civ. No. 06-10492-LTS, 2010 WL 3038091 (D. Mass. July 30, 2010).

20. As addressed above, BSR II has not withheld maintenance and cure payments.

21.     To the extent that Aadland claims that the timing of BSR II's payments to
him were unreasonably delayed, the Court does not agree on this record.

22.     Accordingly, having considered the entirety of the record, the Court does
not conclude that, even if there had been a showing of a failure to pay
maintenance and cure, Aadland has shown that BSR II was callous, willful,
or recalcitrant in such alleged failure and, therefore, his claim under Count
IV fails.

23.     Even assuming that emotional distress damages were recoverable on such
claim, Count IV, the Court does not need to reach this issue because of
Aadland's failure to show that BSR II was callous, willful or recalcitrant in
any such alleged failure to pay maintenance and cure.

## V.      CONCLUSION

In light of these findings of fact and conclusions of law, the Court shall enter judgment for
BSR II on the remaining claims, Counts III and IV.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge