**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MAGNUS AADLAND,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 17-cv-11248-DJC** |
| | ) |
| **BOAT SANTA RITA II, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM OF DECISION**

**CASPER, J.**                                               **December 18, 2023**

**I.      INTRODUCTION**

Plaintiff Magnus Aadland ("Aadland") brought claims against Defendants, including Boat Santa Rita II, Inc. ("BSR II") for claims arising out of his illness incurred while he was a seaman on F/V Linda.  After entering summary judgment on the remaining claims for Defendants, D. 63, only Count III (maintenance and cure claim against BSR II) and Count IV (failure to pay maintenance and cure claim against BSR II) remained for trial.  Id. at 11.  After a bench trial, the Court issued its findings of facts and conclusions of law on the claims and entered judgment for BSR II, including on Counts III and IV.  D. 115; D. 118.  On appeal, the First Circuit reversed in part and vacated in part this Court's judgment and remanded the case.  D. 128; D. 129.  The First Circuit's decision did not concern whether BSR II fulfilled its duty of maintenance to Aadland, D. 128 at 6, but vacated the determination that BSR II had satisfied its cure obligations to Aadland, reversed the determination that Aadland had reached maximum medical recovery and vacated whether Aadland was entitled to compensatory damages for emotional distress, punitive damages and attorneys' fees.  Id. at 29, 39, 48.  For the reasons stated below, the Court enters judgment in

1

favor of BSR II on Count III, as to its satisfaction of its cure obligations from July 18, 2014 to September 2020, and on Count IV, as to compensatory damages, punitive damages and attorneys' fees. The Court enters judgment for Aadland on Count III as to BSR II's ongoing duty after September 2020 to provide cure.

## II.    PROCEDURAL HISTORY

Aadland instituted this action against Defendants BSR II, Boat Santa Rita III, Inc., F/V Linda, Francis A. Patania and Salvatore Patania, Jr. (collectively, "Defendants"), asserting various claims. D. 1. Aadland voluntarily dismissed F/V Linda, the subject of Counts IX and X. D. 10. After the completion of discovery, the remaining Defendants moved for summary judgment on all remaining counts except for Count III. D. 53. In his opposition to same, Aadland did not oppose Defendants' motion for judgment as to Counts II, V, VI, VII, VIII, XI, XII. D. 56 at 1-2. The Court's Memorandum and Order resolved those claims in Defendants' favor and granted summary judgment for BSR II on the contested Count I (Jones Act negligence claim against BSR II). D. 63. That ruling, however, denied summary judgment to BSR II as to the other contested claim against BSR II, Count IV (claim for emotional distress damages, punitive damages and attorneys' fees for failure to pay maintenance and cure). Id. at 10. Accordingly, the only defendant that remained for trial was BSR II on Count III, the maintenance and cure claim, and Count IV, the claim for emotional distress damages, punitive damages and attorney's fees for failure to pay maintenance and cure. Id. at 11.

After a three-day bench trial beginning on September 14, 2020, D. 110, D. 111, D. 113, the Court ruled that (1) Aadland had reached maximum medical recovery, (2) that BSR II had satisfied its duties of maintenance and cure, and (3) that Aadland was not entitled to compensatory damages for emotional distress, punitive damages or attorneys' fees, D. 115 at 7, 9-10, and entered judgment in favor of BSR II, D. 118. Aadland appealed the Court's ruling. D. 119.

2

On appeal, the First Circuit reversed the Court's ruling as to maximum medical recovery ("MMR"), vacated the Court's ruling as to BSR II's satisfaction of its obligation to pay cure, vacated the Court's ruling as to Aadland's entitlement to compensatory damages for emotional distress, punitive damages and attorneys' fees and remanded the case for further proceedings.  D. 128 at  29, 39, 48.  After remand from the First Circuit, the Court solicited the parties' proposal for a new schedule, considered supplemental briefing from the parties on the outstanding issues, heard oral argument and took the matter under advisement.  D. 135; D. 139; D. 140; D. 141; D. 144; D. 147.

III.    **FINDINGS OF FACT**

      A.    <u>**Aadland's Background and Illness**</u>

1.    Aadland was, at all relevant times, the captain of the commercial fishing vessel, the F/V Linda.  D. 115 at 2.[1]

2.    BSR II was, at all relevant times, the sole owner of the F/V Linda.  <u>Id.</u>

3.    Francis A. Patania ("Patania") is the manager and co-owner of BSR II.  <u>Id.</u>

4.    On July 9, 2014, the F/V Linda left New Bedford with a five-person crew captained by Aadland.  <u>Id.</u>

5.    On or about July 12 or 13, 2014, a few days into the trip, Aadland fell ill while in the service of the F/V Linda.  <u>Id.</u>

6.    By July 16, 2014, Aadland was unable to get out of his bunk on the F/V Linda.  <u>Id.</u>

---

[1] As the First Circuit noted, the underlying facts are "not contested" and  the Court primarily draws these facts from its original findings of facts after trial, D. 115, which were not disturbed on appeal, D. 128 at 4.  The Court omits facts related solely to BSR II's fulfillment of its maintenance obligations which are not at issue on remand.  To the extent that this Court is required to make additional findings of fact on remand regarding the issue of cure, it cites to the parties' proposed findings of fact, D. 140, 141,  and the trial record, including testimony and admitted exhibits.

7.     Upon the F/V Linda's return to New Bedford on July 18, 2014, an ambulance and Mrs. Aadland met the vessel at the dock and Aadland was taken to St. Luke's Hospital.  Id. at 2–3.

8.     Aadland's blood cultures taken at the hospital tested positive for group G Streptococcus bacteria.  Id. at 3.

9.     Aadland was hospitalized at multiple medical facilities for an extended period, from July 18, 2014 to December 29, 2014 and then again from July 9, 2015 to September 10, 2015. Id.

10.    During his hospitalizations, Aadland had multiple surgeries including a cardiac surgery on December 5, 2015 and a second cardiac surgery in July 2015.  Id.

11.    Aadland received physical and occupational therapy intermittently throughout his treatment in 2015 and 2016.  Tr. Ex. 91 at 693, 981, 1022, 1050.

12.    On April 25, 2019, Aadland began another course of physical therapy.  Id. at 1155–57. Aadland was discharged from physical therapy on June 26, 2019.  Id. at 1101.  In his physical therapy discharge note, his physical therapist noted that he had "plateaued with treatment" and indicated that he would continue with a home exercise program.  Id.

13.    On May 29, 2019, Aadland began a course of occupational therapy from which he was discharged on July 24, 2019 with a home exercise program.  Id. at 1077, 1138.

14.    Although the Aadlands sometimes disagreed with Tufts, his health insurer, about the treatment facilities during his hospitalizations in 2014 and 2015, there was no evidence that Aadland required any medical treatment that he did not receive.  D. 115 at 3.

4

15.     There was also no evidence that Tufts ever refused to cover Aadland's medical expenses because they arose from a work related injury.  See D. 141 at 53 (stating that "Tufts potentially had a lien against Plaintiff's recovery").

16.     Throughout Aadland's 2014 hospitalization, Mrs. Aadland was in regular communication with Patania about Aadland's condition.  Id. at 5.  They began communicating by text when Patania texted her on the morning of July 18, 2014 to inquire about Aadland's condition.

17.     Patania visited Aadland several times during his hospitalization.  Id.

18.     Patania was aware that Tufts was paying for Aadland's medical treatment.  Id.

19.     Although there were numerous setbacks in Aadland's health, there were no indications to Patania or BSR II that he was not receiving reasonable and adequate medical care.  Id.

20.     In fact, Aadland expected to return to work as early as spring of 2015.  Id.

21.     Although as a vessel owner, Patania had encountered claims from seamen before, Aadland was the first seaman whose medical bills were paid by a private insurer.  Id.

   **B.     Coverage by Aadland's Health Insurance**

   *1.     July 18, 2018 Through September 30, 2014*

22.     Aadland received a Tufts family health insurance plan ("Tufts Employer Plan") through the employer, GAF Engineering, of his wife, Mrs. Aadland, from July 18, 2014 through September 30, 2014.  Id. at 3; D. 141 at 30.

23.     Aadland and Mrs. Aadland shared finances, combined their earnings into joint accounts to pay their bills and filed joint tax returns.  D. 122 at 73–74, 183–84; D. 141 at 29.

24.     From July 18, 2014 through September 30, 2014, the Tufts Employer Plan premiums were deducted from Mrs. Aadland's paychecks.  D. 122 at 71–72; D. 123 at 27–28; D. 141 at 30.

25.     Mrs. Aadland stopped working at GAF Engineering at the end of September 2014.  D. 115 at 3; D. 141 at 31.

26.     From July 18, 2014 through September 30, 2014, Aadland's medical providers accepted a total of $109,642.51 from Tufts in satisfaction of his medical bills.  D. 140 at 12; D. 141 at 49.

        *2.     October 1, 2014 Through December 29, 2014*

27.     From October 1, 2014 through December 29, 2014, Aadland was covered by a Tufts COBRA health insurance plan ("Tufts COBRA Plan").  D. 122 at 72; D. 141 at 31.

28.     From October 1, 2014 through December 29, 2014, the premiums for the Tufts COBRA Plan were paid from Aadland and his wife's joint checking account and by loans Aadland took out on his life insurance policy.  D. 122 at 72–74; D. 123 at 26–28; D. 141 at 31.

29.     From October 1, 2014 through December 29, 2014, Aadland's medical providers accepted $212,354.17 from Tufts in satisfaction of his medical bills.  Tr. Ex. 93; D. 141 at 49-50.

        *3.     December 30, 2014 Through September 2020*

30.     From December 30, 2014 through March 31, 2017, Aadland continued to pay for coverage under the Tufts COBRA plan.  D. 123 at 52–53; Tr. Ex. 93; D. 141 at 31.

31.     On April 1, 2017, Aadland obtained health care coverage through Medicare as well as a Tufts supplemental health insurance plan ("Tufts Supplemental Plan").  D. 122 at 100; D. 123 at 21–24, 52–53, 74; D. 141 at 33.

32.     Premiums for Medicare were deducted from Aadland's social security check.  D. 141 at 45 (citing D. 122 at 100; D. 123 at 21–24, 74).

33.     Aadland paid for the Tufts Supplemental Plan from his joint checking account with his wife.  D. 141 at 45 (citing Tr. Exs. 58–63).

34.   From December 30, 2014 through September 2020, Aadland's medical providers accepted $283,341.39 from Tufts in satisfaction of his bills.  Tr. Ex. 93; D. 141 at 50.

35.   In total, Tufts paid Aadland's medical providers $605,338.07 for treatment from July 18, 2014 to September 2020.  Tr. Ex. 93; D. 141 at 54.

C.   **BSR II's Payments**

36.   Since February 5, 2015 (and retroactive to December 30, 2014), BSR II has paid advances to Aadland at a daily rate of $114.00.  D. 115 at 4; D. 141 at 41.

37.   Each advance was accompanied by a receipt identifying the payment as "an ADVANCE toward any settlement, judgment or award resulting from my claim for personal injuries or illness occurring on or about 7/20/2014, while aboard the F/V LINDA."  Tr. Ex. 41; Tr. Ex. 48; see D. 122 at 89.  The advance receipts further stated, "I understand that the amount of any settlement, judgment or award will be reduced by the amount of this advance."  Tr. Ex. 41; D. 41 at 44.

38.   As of the September 2020 trial, BSR II had paid Aadland a total of $238,374.00 in advances.  D. 115 at 4; D. 140 at 8; D. 141 at 42.

39.   Aadland has not repaid any of those advances.  Id.

40.   Aadland's ten-year history of earnings averaged $186,000 per year or approximately $509.58 per day.  Id.

41.   Retroactive to December 30, 2014, between maintenance of $84/day and advances of $114/day, Aadland has received $198/day from BSR II.  Id.

42.   The Aadlands used the maintenance and advance payments to pay household bills including but not limited to health insurance premiums.  Id.

43.   BSR has also paid Aadland $5,388.24 in reimbursement for out-of-pocket medical expenses.  Id. at 5.

44.    Aadland never submitted any other claims for out-of-pocket expenses to BSR II.  Id.

45.    Aadland has not presented any evidence of any unreimbursed out-of-pocket medical expenses.  Id.

46.    There was no expense or bill related to Aadland's medical care that was presented to BSR II that was refused.  Id.

47.    In September 2020, Tufts accepted $400,000.00 from BSR II in full satisfaction of any lien or claim it might have against Aadland or Mrs. Aadland for coverage of Aadland's medical expenses.  Id.; Tr. Ex. 95.

IV.    **CONCLUSIONS OF LAW**

1.    Upon consideration of the opinion and judgment of the First Circuit, D. 128, D. 129, and the parties' supplemental briefs, D. 140, D. 141, D. 144, the Court must address three outstanding issues to resolve this case.

2.    As to the remaining portion of Count III, Aadland's claim for cure, the Court must determine (1) whether Aadland has reached MMR, such that BSR III has no ongoing duty to cure and (2) the measure of BSR II's cure obligation as of September 2020 and whether that obligation is offset by any payments already made.  D. 128 at 36–38, 47–48.

3.    As to Count IV, Aadland's claim for compensatory damages for emotional distress, punitive damages, and attorneys' fees, (3) the Court must determine whether Aadland is entitled to such relief based on BSR II's failure or delay in meeting its cure obligation.  Id. at 38–39.

A.    **Maximum Medical Recovery**

4.    When a seaman becomes injured or ill aboard a vessel, the vessel's owner must pay maintenance and cure as compensation.  Richards v. Relentless, Inc., 341 F.3d 35, 40 n.1 (1st Cir. 2003) (citing Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 527–28 (1938)).

Maintenance "refers to the provision of, or payment for, food and lodging" whereas cure refers to "any necessary health-care expenses . . . incurred during the period of recovery from an injury or malady." Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 454 (1st Cir. 1996) (citation omitted).

5.    The shipowner's duty to provide maintenance and cure ends when the seaman reaches MMR. Whitman v. Miles, 387 F.3d 68, 72 (1st Cir. 2004).

6.    "Even when a seaman's 'progress ended short of a full recovery, the seaman . . . is no longer entitled to maintenance and cure' once the shipowner has proven by a preponderance of the evidence that the seaman has reached the point of maximum medical recovery." D. 128 at 40 (quoting Whitman, 387 F.3d at 72).

7.    When it appears that "future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." Saco v. Tug Tucana Corp., 483 F. Supp. 2d 88, 99 (D. Mass. 2007) (internal quotations and citation omitted). That is, "[w]hen further treatment is merely palliative, rather than curative, a shipowner's obligation to pay maintenance and cure ends." Silva v. F.V Silver Fox LLC, 988 F. Supp. 2d 94, 99 (D. Mass. 2013); see Whitman, 387 F.3d 72.

8.    MMR must be based on a "medical" rather than "judicial[] determination of permanency." D. 128 at 42 (quoting Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 202 (1st Cir. 1980)).

9.    "The burden is on the shipowner to provide evidence that supports, by a preponderance of evidence, its assertions regarding 'the earliest time when it is reasonably and in good faith determined by those charged with the seaman's care and treatment that the maximum cure

reasonably possible has been effected.'" Id. (quoting Hubbard, 626 F.2d at 202 (internal citation omitted).

10.    On appeal, the First Circuit reversed this Court's conclusion that Aadland had reached MMR and that BSR's duty to provide cure had terminated as of July 2019.  D. 128 at 48.

11.    In particular, the First Circuit concluded that (1) a note discharging Aadland from occupational therapy to a home exercise program in 2019, (2) Aadland's October 12, 2018 deposition testimony that "he only saw his cardiologist, infectious disease doctor and primary care physician every six months for checkups" and (3) Aadland's 2016 ski trip to Maine were, individually and combined, insufficient to establish that Aadland had attained MMR.  Id. at 44–48.

12.    On remand, BSR II asserts that the First Circuit did not assess the full trial record, including statements made by Aadland's physicians as to his improved medical condition.  D. 141 at 25-26 (quoting Tr. Ex. 90 at 772, 786, 820).

13.    In the statements identified by BSR II on remand, id., Aadland's physicians expressed positivity towards Aadland's progress, prescribed him certain medications "for life" and indicated that "there are no further surgical options available should he develop another bioprosthetic valve infection."  Tr. Ex. 90 at 772, 786, 820.  These statements were made between November 2015 and September 2016.  Id.

14.    While the statements identified by BSR II reflect progress in Aadland's medical condition as of fall 2016, they do not account for Aadland's continued improvement as a result of physical and occupational therapy thereafter.  See In re RJF Int'l Corp. for Exoneration from or Limitation of Liab., 354 F.3d 104, 107 (1st Cir. 2004) (rejecting proposition that

MMR is reached "whenever a permanent condition exists, regardless of whether its severity

can be reduced" since "maximum medical recovery" is the "dividing line").

15.   For one example, on November 14, 2018, Aadland's expert medical witness, Dr. Alexander

McMeeking, opined that Aadland could "realize an improvement in his balance and gait"

if "provided with appropriate rehabilitation physical therapy and occupational therapy."

Tr. Ex. 64 at 4.

16.   Aadland's 2019 occupational and physical therapy notes indicate improvement in his

mobility and function, not just palliative care or maintenance of his then-present condition.

See, e.g., Tr. Ex. 91 at 1104 (reporting that Aadland had "improved functional finger

flexion for grasping"); id. at 1124 (reporting that treatment provided was to "allow for

improved manual work and increase motion"); id. at 1142 (reporting that Aadland had

made "good progress" towards his short-term goals and noting other improvements).

17.   Although Aadland's physical therapist indicated that Aadland's progress had "plateaued

with treatment" in his physical therapy discharge note in 2019, id. at 1101, the First Circuit

has already ruled that a similar, occupational therapy discharge note from the same time

period does not provide a basis for concluding that Aadland reached MMR.  D. 128 at 45–

46.

18.   For all of these reasons, the Court concludes that BSR II has not satisfied its burden to

prove that Aadland reached MMR as of September 2020, particularly when it had a full

and fair opportunity to do so at trial.  D. 140 at 24.

   **B.**      **BSR II's Duty to Provide Cure**

            *1.   Measure of Cure Obligation*

19.   As the First Circuit explained, the appropriate measure of BSR II's duty to provide cure is

the amount that "his healthcare providers accepted as payment for his care from his insurer"

rather than the "sticker price" originally billed by the healthcare providers.  D. 128 at 33–34; Manderson v. Chet Morrison Contractors, Inc., 666 F.3d 373, 382 (5th Cir. 2012).

20.   Thus, BSR II's cure obligation is $605,338.07, the amount Tufts paid to Aadland's medical providers.  D. 141 at 49; D. 128 at 33.

21.   BSR II argues that the Court should set off various payments made by BSR II or by Tufts against the total cure obligation.  D. 141 at 10–18.  The Court turns to each of these matters.

       2.    *Tufts's Payments to Medical Providers*

22.   Between October 1, 2014 through December 29, 2014, Tufts paid medical providers $212,354.17 to satisfy Aadland's medical bills.  D. 141 at 49-50.

23.   In a seaman's suit for maintenance and cure, unlike in a tort case, the seaman's recovery may be reduced by the amount of assistance he received from an alternate source.  Smith v. United States, 943 F. Supp. 159, 172 n.11 (D.R.I. 1996) (explaining that "collateral source rule is not strictly applied"); see Manderson, 666 F.3d at 381 (stating that "collateral-source rule appears incompatible with maintenance and cure"); Bickford v. Marriner, No. 2:12-CV-00017-JAW, 2012 WL 6727531, at *9 (D. Me. Dec. 28, 2012) (explaining that evidence of insurer's payment of medical bills could have been admissible if plaintiff were pursuing recovery for medical bills under maintenance and cure theory).

24.   This limitation on the seaman's recovery is tied to "the well-established rule that seamen may recover only those expenses actually incurred."  Smith, 943 F. Supp. at 172 n.11; see Manderson, 666 F.3d at 382.

25.   The Fifth Circuit has recognized an exception to the typical rule in maintenance and cure cases.  In Gauthier, the Fifth Circuit held that "where a seaman has alone purchased medical insurance" that covers his medical expenses, a shipowner cannot set off its maintenance

and cure obligations with the insurer's payments.  <u>Gauthier v. Crosby Marine Serv., Inc.</u>, 752 F.2d 1085, 1090 (5th Cir. 1985).

26.     In its previous post-trial ruling, this Court concluded that <u>Gauthier</u> was factually distinguishable from the present case, noting that:

> Unlike the circumstances there which the court analogized to an instance where a shipowner disregarded an injured seaman's maintenance and cure claim and then wanted to set off any money earned by the seaman during the pendency of the claim, <u>id.</u> (citing <u>Vaughn</u>, 369 U.S. 527, 533 (1962)), there was no such refusal here.  This case is closer to the circumstances distinguished in <u>Gauthier</u> where an injured seaman received care "without cost to himself" such that he not "incurred any actual expense."  <u>Id.</u> (citing <u>Johnson v. United States</u>, 333 U.S. 46, 50 (1948).  The circumstances here are closer to <u>Johnson</u> where Aadland has not incurred any medical expenses himself and even his health insurance premiums, which were part of the basis of the calculation of the advances he has received from BSR II, have been covered.  D. 115 at 8-9.

27.     The First Circuit concluded that this Court's basis for distinguishing <u>Gauthier</u> was erroneous because it "rested, at least in part, on the ground that Aadland failed to request cure as the seaman in that case had."  D. 128 at 20.

28.     This Court made no such conclusion of law or distinguishing of <u>Gauthier</u> in its prior ruling on this basis, <u>see generally</u> D. 115, and does not do so now.

29.     Nonetheless, the First Circuit has remanded on this issue for this Court to reconsider if and how <u>Gauthier</u>'s "no-set-off rule" applies to the present case.  D. 128 at 21–22, 34–37.  This Court now returns to <u>Gauthier</u>.

30.     <u>Gauthier</u> purports to limit recovery to a seaman's "incurred expenses" but treats expenses paid by a medical insurer as incurred by the seaman so long as "he alone paid the medical insurance premiums."  <u>Gauthier</u>, 752 F.2d at 1090; <u>see</u> <u>Block Island Fishing, Inc. v. Rogers</u>, 844 F.3d 358, 365–66 (1st Cir. 2016) (recognizing that the "norm" is that a seaman may recover only his "actual living expenses," citing <u>Johnson</u>, 333 U.S. at 50, but holding that

a seaman "may recover reasonable expenses beyond the amount he actually incurred, even if it is the exceptional case where the seaman's reasonable expenses will exceed his actual expenses").

31.     Although Gauthier is not binding on this Court, it guides this Court's analysis of whether this is a case in which Aadland alone incurred expenses or if BSR II is "relieved of the obligation to pay that part of [Aadland's] cure furnished by others at no expense to [Aadland]."  See Gauthier, 752 F.2d at 1090 (distinguishing cases where seamen "alone paid the medical insurance premiums" or "was forced to work to survive" from cases where seamen "lived off the charity of others").

a)     July 18, 2014 to September 2014

32.     As to the period between July 18, 2014 and September 2014, when Aadland's medical bills were covered by the Tufts Employer Plan and the insurance premiums for same were deducted from Mrs. Aadland's paycheck.

33.     In the language of Gauthier, Aadland actually incurred the expense of obtaining such coverage if he "alone" purchased the coverage.  Id. at 1090 (distinguishing Johnson, 333 U.S. 46).

34.     Aadland should be entitled to recover his medical expenses, even though they were paid for by Tufts, so long as the insurance was not gifted to him by a third party, but rather a reasonable expense paid out of his shared finances with his wife.  Block Island, 844 F.3d at 366; see D. 128 at 23 (expressing skepticism that "the use of one spouse's paycheck to fund the insurance of the other is necessarily a 'gift' from the one to the other in the same way that perhaps a parent paying the premiums of an adult child might be viewed" and explaining that a spouse's payment of mortgage while a seaman is injured would not constitute a "gift").

14

35.   The parties agree that Aadland and his wife combined their earnings into joint accounts and otherwise shared their finances. D. 141 at 29–30.

36.   The payment of insurance premiums from Mrs. Aadland's paycheck was not a gift, but rather a payment from the couple's shared finances.  See D. 128 at 23.

37.   Deduction of insurance premiums from Mrs. Aadland's paychecks deprived Aadland himself of the ability to spend that money on other necessities or incidentals.  Compare Vaughan, 369 U.S. at 533 (ruling that maintenance and cure could not be reduced by wages earned by recovering seaman who was forced to work as a taxi driver), with Johnson, 333 U.S. at 50 (holding that shipowner was need not provide maintenance and cure for period that he rested at parents' ranch).

38.   Accordingly, BSR II may not offset its cure obligation with the $109,642.51 Tufts paid to satisfy Aadland's medical bills from July 18, 2014 through September 2014.  D. 141 at 49.

b)   October 1, 2014 to December 29, 2014

39.   As to the period between October 1, 2014 and December 29, 2014, Aadland paid for his Tufts COBRA plan out of his joint checking account with his wife and using loans he took out against his life insurance policy.  D. 141 at 31.

40.   Given his shared finances with his wife and the fact that Aadland himself took out loans to pay for this coverage, the Court concludes that Aadland also purchased this insurance "alone."  See Gauthier, 752 F.2d at 1090.

41.   Accordingly, BSR II also may not offset its cure obligation with the $212,354.17 Tufts paid to satisfy Aadland's medical bills from October 1, 2014 through December 29, 2014. D. 141 at 49-50.

c)   <u>December 29, 2014 to September 2020</u>

42.   As to the period of December 29, 2014 through September 2020, Tufts COBRA and/or Tufts Medicare Supplemental Plans paid $283,341.39 to Aadland's medical providers.  D. 141 at 50.

43.   Aadland continued to pay for the Tufts COBRA and Supplemental Plans from his joint checking account with his wife.  D. 141 at 45 (citing Tr. Exs. 58–63).

44.   Aadland was also covered by Medicare and those premiums were deducted from Aadland's social security check.  D. 141 at 45 (citing D. 122 at 100; D. 123 at 21–24, 74).

45.   Accordingly, BSR II may not set off its cure obligation with the $283,341.39 paid under Aadland's Tufts COBRA Plan and Tufts Supplemental Plan between December 29, 2014 through September 2020.  D. 141 at 50.

46.   BSR II argues that the Court cannot conclude that Aadland paid for his Tufts plans "alone" because its $114 per day advances accounted for the cost of health insurance.  D. 141 at 49–50; <u>see</u> <u>Shaw v. Ohio River Co.</u>, 526 F.2d 193, 200–01 (3d Cir. 1975) (concluding that shipowner could set off the medical expenses paid for by a health insurance plan it provided to its seamen at no expense to themselves).

47.   Unlike the shipowner in <u>Shaw</u>, however, BSR II itself did not purchase or provide health insurance on Aadland's behalf.  <u>Cf.</u> <u>Shaw</u>, 526 F.2d at 201 (explaining that medical coverage was paid for at employer's expense, rather than the seaman's, as required by collective bargaining agreement).

48.   Instead, BSR II issued advances to Aadland, which did not require Aadland to spend the advance payments on health insurance as opposed to other necessities or incidentals.

49.   Although BSR II's insurance broker included the health insurance premiums in his calculation of the appropriate maintenance and advance payments due to Aadland, BSR II

did not communicate to Aadland any intent that the advances be used for health insurance. D. 122 at 85–86.

50.     Accordingly, the Court concludes that BSR II's advances to Aadland do not mean that Aadland did not pursue his insurance alone such that the Gauthier analysis would not apply and these advances do not reduce its cure obligation.

51.     In sum, from July 18, 2014 through September 2020, Aadland paid for insurance coverage for medical treatment at his own expense and thus is entitled to cure without a reduction for payments made by Tufts.

52.     Thus, BSR II's cure obligation is $605,338.07, the amount that Tufts paid to Aadland's health care providers.  D. 140 at 11; D. 141 at 49; 144 at 12.

        *3.     BSR II's $400,000 Payment to Tufts*

53.     BSR II paid $400,000 to Tufts to satisfy Aadland's obligation to repay Tufts for any medical bills paid for his work-related illness.

54.     Although Aadland denies that BSR II's $400,000 payment to Tufts was "satisfaction of its cure obligation, under the law," D. 140 at 13, he acknowledges this amount "should be credited towards its cure obligation."  Id.

55.     Accordingly, the Court applies this amount against BSR II's cure obligation of $650,338.07 so that the remaining cure obligation is  $205,338.07.  D. 140 at 14.

        *4.     BSR II's Advance Payments to Aadland*

56.     Although, as explained above, BSR II's advances did not reduce its cure obligation in the first instance, the advances remain relevant to what amount BSR II now owes Aadland.

57.     The advances were characterized as an "ADVANCE toward any settlement, judgment or award resulting from my claim for personal injuries or illness occurring on or about 7/20/2014, while aboard the F/V LINDA."  Tr. Ex. 48; D. 141 at 43.  The advance receipt

17

expressly provides that "any settlement, judgment or award will be reduced by the amount of this advance." Tr. Ex. 48.

58. The Court must enforce the terms of this contract between Aadland and BSR II, which provides that any future judgment against BSR II be reduced by the amount of the advances paid. Sabow v. Am. Seafoods Co., 737 F. App'x 322, 324 (9th Cir. 2018) (reversing district court's denial of defendant's request to reduce its maintenance obligation to plaintiff by amount advanced); Debbie Flo, Inc. v. Shuman, No. 13-2650 (RBK/JS), 2014 WL 461179, at *3–4 (D.N.J. Feb. 5, 2014) (crediting advances to defendant's maintenance obligation).

59. Aadland objects that BSR II cannot use its advance payments to satisfy "past due maintenance and cure obligations" rather than "to payments that would become due in the future." D. 144 at 10. This distinction is not supported by the case law.

60. For instance, in Sabow, the Ninth Circuit ruled that a shipowner's obligation to pay additional maintenance arising from an injury that occurred on April 2015 must be reduced by an advance payment that the shipowner made in July 2015. Sabow, 737 F. App'x at 324 (reversing district court's denial of credit for advance payment).

61. Sabow did not suggest that the credit applies only to obligations that arose after the issuance of the advance. See Sabow, 737 F. App'x at 324.

62. Nor does the advance receipt itself limit the reduction of "any settlement, judgment or award" to those arising from maintenance and cure liabilities post-dating the issuance of the advance. Tr. Ex. 48.

63. Indeed, it would have been illogical for BSR II to have issued its first advance retroactively dating to December 30, 2014, D. 141 at 41, if the limitation proposed by Aadland were imposed.

64. Accordingly, BSR II's cure obligation must be reduced by the monies it has paid Aadland in advances.

   5.   *BSR II's Satisfaction of Its Cure Obligation*

65. As noted above, BSR II's cure obligation in this case was $605,338.07, the amount Tufts paid to Aadland's medical providers between July 18, 2014 and September 2020.  D. 141 at 49; see D. 128 at 33.

66. $605,338.07 less the $400,000 credit for BSR II's payment to Tufts is $205,338.07.  BSR II's remaining cure obligation is thus $205,338.07.

67. Given the $238,374.00 in advances paid, which must be deducted from the judgment in Aadland's favor of $205,338.07, BSR II's liability to Aadland for cure is satisfied through September 2020 and the difference of $33,035.93 is a credit against any continuing cure obligation on BSR II after September 2020.  D. 140 at 14; D. 141 at 8.

**C.   Entitlement to Compensatory Damages for Emotional Distress, Punitive Damages and Attorneys' Fees**

68. The First Circuit also vacated this Court's judgment as to Aadland's entitlement to damages for emotional distress, punitive damages and attorney's fees.  D. 128 at 39.

69. Aadland seeks $1,500,000 in compensatory damages for emotional distress that he suffered as a result of "BSR II's unreasonable withholding of maintenance and cure benefits and failure to fulfill its maintenance and cure duties and obligations."  D. 140 at 22.

70. For the reasons stated above, the Court has found and concluded anew on remand, for the reasons explained herein, that Aadland is not entitled to damages he seeks.

71. The First Circuit, however, specifically noted that this Court had not "address[ed] the fact that, from the time Aadland fell ill at sea to the time of this suit, Aadland faced the risk of

19

a lawsuit by his insurer to recover the cost of the healthcare his insurance had paid for." D. 128 at 39.  The Court turns to this issue now.

2.      *Compensatory Damages for Emotional Distress*

72.     As to emotional distress, Aadland now asserts that he and his wife testified at trial that he "suffered from stress related to the constant coverage disputes with Tufts."  D. 140 at 20.

73.     Aadland's testimony at trial, however, specifically concerned his stress over reduced income (as a result of his injury and hospitalizations) and disputes with Tufts about where he would receive his medical treatment and the course of physical therapy that it was covering.  D. 122 at 105-08; see D. 123 at 10, 55-56, 63.

74.     The parties agree that, under the Tufts health insurance policy, if used for work-related injuries, then Aadland would be liable to Tufts for the $605,338.07 it paid to his medical providers.  D. 141 at 71.

75.     The parties also agree that BSR II's $400,000 payment to Tufts in September 2020 satisfied any lien Tufts might have against Aadland for the $605,338.07 it paid to his medical providers.  Id.  at 71; Tr. Ex. 95.

76.     Nothing in the trial record shows that Tufts threatened to stop covering Aadland's medical bills because a work-related injury was outside his insurance policy.  See Tr. Exs. 30, 95. Nor did the evidence at trial show when, prior to Tufts' receipt of the $400,000 payment, Aadland became aware that Tufts policy on work-related injuries might be invoked to exclude his treatment from coverage.

77.     The trial testimony instead indicates that Aadland's stress was caused by disputes over his admission to a skilled nursing facility (as opposed to an acute rehabilitation facility) and the frequency of his physical and occupational therapy, rather than whether his Tufts' health plan covered his work-related illness.  D. 122 at 105–108 (testifying that Tufts was

"paying medical bills, but they prevented me from going to PT and OT as often as I wanted to down at Spaulding Cape Cod as an outpatient"); D. 123 at 10 (testifying that during two-week period Aadland "wasn't really happy with his condition" and witnessed his wife "having a daily conversation with Tufts trying to — basically fighting about where he goes"); id. at 56 (testifying that watching wife dispute treatment with Tufts "really does weigh" on Aadland).

78.     The record contains no evidence that Tufts denied any medically necessary care.

79.     A shipowner's duty to provide cure does not require the provision of all medical services desired by the seaman until the seaman is completely restored to health, but rather "care in the sense of necessary medical and nursing attention for a reasonable time."  Muise v. Abbott, 160 F.2d 590, 590 n.1 (1st Cir. 1947); see Saco, 483 F. Supp. 2d at 104–05 (holding that services rendered by nurse's aide, except for transportation to medical appointments, were not medically necessary and thus would not fall within the shipowner's coverage for cure).

80.     Thus, the evidence does not show that had BSR II timely fulfilled its cure obligation, either by direct payment or through its insurer, it would have paid for any treatment that Aadland did not otherwise receive or that was not covered by Tufts.

81.     The Court concludes that the trial record contains no evidence of emotional distress that was caused by BSR II's failure to cure or delay in doing so.

82.     Moreover, Aadland submits no evidence of emotional distress beyond his own and his wife's testimony that he was stressed and unhappy about Tufts' decision not to provide him care at facilities of his choice and refusal to allow additional physical and occupational therapy.  Bullard v. Cent. Vermont Ry., Inc., 565 F.2d 193, 197 (1st Cir. 1977) (concluding

that accident survivor's own testimony as to feelings of sadness would not support damages for emotional distress which require "evidence from which a jury can make an informed judgment as to the existence, nature, duration and seriousness of the condition").

83. While expert testimony is not required to prove emotional damages, its absence is relevant to the determination of the size of any award, Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 724 (1st Cir. 1994), based upon the evidence presented. See D. 122 at 119 (testifying that he never sought treatment for stress or anxiety).

84. Moreover, a factfinder is not required to accept the plaintiff's uncorroborated testimony of emotional distress. See Acevedo-Luis v. Pagan, 478 F.3d 35, 40 (1st Cir. 2007); Davet v. Maccarone, 775 F. Supp. 492, 494 (D.R.I. 1991), aff'd, 973 F.2d 22 (1st Cir. 1992).

85. Accordingly, the Court concludes that Aadland has not proved by a preponderance of the evidence that he experienced distress as a result of any failure or delay on BSR's part to meet its cure obligation and, accordingly, compensatory damages for emotional distress are not warranted here.

### 3. Punitive Damages and Attorneys' Fees

86. Aadland "bears the burden of proving defendant was 'callous, willful, or recalcitrant' in withholding maintenance and cure payments" such that punitive damages or fee-shifting is justified. Mulligan v. Maritrans Operating Co., No. CIV.A. 06-10492-LTS, 2010 WL 1930282, at *5 (D. Mass. May 12, 2010) (quoting Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051 (1st Cir.1973)).

87. Even for any delay in cure, BSR II's actions were not "callous, willful, or recalcitrant." Trupiano v. Captain Gus & Bros., 42 F.3d 1384, 1994 WL 702324, at *1 (1st Cir. 1994) (per curiam) (unpublished) (affirming denial of fee-shifting and punitive damages even where defendant failed to timely pay maintenance and cure); cf. Robinson, 477 F.2d at

22

1052 (ruling that instruction on punitive damages was warranted where defendant falsely asserted that seaman was fired for cause, refused to pay unearned wages when notified that plaintiff was in danger of losing his home and terminated all payments when plaintiff declined settlement offer).

88.     As previously noted, BSR II paid regular advances to Aadland to cover his mortgage payments, insurance payments, and living expenses, it paid his out-of-pocket medical expenses, there were not any medical expenses presented to BSR II that it declined to pay, and ultimately, it paid Tufts in satisfaction of any lien or claim Tufts might bring against Aadland.  Patania was in close contact with Aadland throughout his treatment.  Also, on the record here, Aadland timely received all care deemed medically necessary.

89.     Indeed, as the First Circuit's opinion and this Court's analysis above reveals, it was not clear given the unusual facts of this case whether BSR II was liable for Aadland's medical treatment where it was covered by private insurance paid for with deductions from his wife's paycheck or made from their joint account including when Aadland was receiving advances from BSR II.  D. 128 at 23–28; see Manderson, 666 F.3d at 383 (reversing district court's award of attorneys' fees where defendant presented evidence in support of contention that seaman was not owed maintenance and cure due to undisclosed pre-existing condition, which district court rejected); Harper v. Zapata Off-Shore Co., 741 F.2d 87, 91 (5th Cir. 1984) (declining to impute bad faith to "decision to pay what [shipowner] considered to be the legal minimum" and reversing award of punitive damages and attorneys' fees).

90.   Having considered the entirety of the record, the Court concludes that, even if BSR II had failed to cure in a timely manner, Aadland has not shown that BSR II was callous, willful, or recalcitrant in such failure.  Therefore, his claim under Count IV fails.

## V.   CONCLUSION

In light of these findings of fact and conclusions of law, the Court enters judgment for BSR II on Count III, as to its satisfaction of its maintenance and cure obligations until September 2020, and on Count IV as to compensatory damages for emotional distress, punitive damages and attorneys' fees.  The Court enters judgment for Aadland on Count III as to BSR II's ongoing duty after September 2020 to provide cure where MMR has not been shown.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge